AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

FILED
Sep 16, 2026
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

United States of America
v.

JOSE DIARTE-PEREZ,
CARLOS BELTRAN-OCHOA, AND
LAMBERTO ELORZA-CHAVEZ

*Defendant(s)*

Case No. 1:26-mj-00108-FJS

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of September 11, 2026 in the county of Tulare in the Eastern District of California, the defendant(s) violated:

*Code Section* *Offense Description*

See attached penalty slip

This criminal complaint is based on these facts:

See Affidavit of Special Agent James Johnson, attached hereto and incorporated by reference.

☑ Continued on the attached sheet.

*Complainant's signature*

James Johnson, HSI Special Agent

*Printed name and title*

Submitted to me by email/pdf and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1, and 41(d)(3).

Date: September 15, 2026

*Judge's signature*

City and state: Fresno, California

Hon. Frank J. Singer, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, James E. Johnson, Special Agent, Homeland Security Investigations, Department of Homeland Security, being duly sworn, do depose and state:

## I. AGENT'S BACKGROUND

1. I am a Special Agent with the United States Department of Homeland Security (DHS), United States Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I have the authority to conduct Title 21 investigations and enforcement activities. I have been involved with multiple investigations involving Title 21 offenses, to include TIII intercepts, controlled purchases and undercover operations. Furthermore, I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2. I have held my current position with HSI since June of 2018. I was previously employed as a Deportation Officer with Enforcement and Removal Operations (ERO) in Fresno, California. I have also previously been employed as a United States Border Patrol Agent, where I started my federal law enforcement career in San Diego, California in 2010. I obtained a Bachelor of Arts, with honors, in Political Science from the California State University, San Jose in San Jose, California.

3. I am a graduate of the Federal Law Enforcement Training Center (FLETC) Criminal Investigator Training Program (CITP) and the Homeland Security Investigations Special Agent Training (HSISAT) course. During these courses, I received training in various types of criminal investigations, including investigations involving the illegal trafficking of narcotics, currency, firearms, and contraband.

4. My training and experience in narcotics enforcement have included narcotics interdiction, the identification of different types of narcotics, and the investigation of persons in possession of narcotics for purposes of sales and transportation. In addition, I speak regularly

with narcotics investigators at the federal, state and local level regarding the manner in which sellers of narcotics store, transport and sell narcotics.

5. I have participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting physical and electronic surveillance, working with informants, and the execution of search and arrest warrants.

6. While employed as a HSI Special Agent, I have spoken to and received training from more seasoned Narcotic Investigators in the fields of clandestine narcotic laboratories, narcotic identification, and investigations involving narcotic offenses. I also routinely participate in narcotic-related surveillances of known narcotics dealers.

7. I have received special training in the methods used by drug traffickers to illegally produce, transport, and distribute methamphetamine and other controlled substances. I am familiar with all the formal methods of investigations, including, but not limited to, electronic surveillance, visual surveillance, general questioning of witnesses, search warrants, confidential informants, and the use of undercover agents. I have participated in investigations involving organizations involved in the manufacture, distribution, and possession with intent to distribute controlled substances, including, but not limited to, methamphetamine**.**

9. This Affidavit is made to support a complaint charging **Jose DIARTE-Perez** and **Carlos BELTRAN-Ochoa** with one count of conspiracy to manufacture, distribute, and possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 846, 841, and with one count of possessing a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A); and also charging **Lamberto ELORZA-Chavez** with one count of an illegal alien in possession of a firearm, in violation of 18 U.S.C § 922(g)(5). In support of this complaint, I have alleged only those facts necessary to support a probable cause determination and have not alleged herein each and every fact disclosed by the underlying investigation.

## II. FACTS ESTABLISHING PROBABLE CAUSE

10. On September 10, 2026, Detective (Det.) Buck, a member of the investigative team was conducting surveillance at 23284 Ave 84 and 23285 Ave 84 in Terra Bella,

California. While conducting surveillance, Det. Buck observed two individuals behind the residence located at 23285 Ave 84. The two individuals were viewed exiting a wooden shed. Det. Buck observed one individual, later identified as **BELTRAN-Ochoa,** carrying what appeared to be a pot from the wooden shed and then pouring an unknown liquid substance onto the ground. Det. Buck also observed the other individual, later identified as **DIARTE-Perez,** entering and exiting the wooden shed. Det. Buck also observed other individuals going and coming from 23284 Ave 84 to 23285 Ave 84.

11. As a result of Det. Buck's observations, he submitted a residential search warrant to the California Superior Court of Stanislaus County for the residences located at 23284 Ave 84 and 23285 Ave 84 in Terra Bella, California. The Honorable Judge Villalobos signed the warrant on September 10, 2026.

12. On September 11, 2026, the investigative team executed the residential search warrants at 23284 Ave 84 and 23285 Ave 84 in Terra Bella, California.

13. During the execution of the residential search warrant at 23285 Ave 84, the investigative team encountered **Jose DIARTE-Perez** and **Carlos BELTRAN-Ochoa** within the residence. **DIARTE-Perez** and **BELTRAN-Ochoa** were immediately detained and taken to a nearby law enforcement vehicle. The investigative team located a blue Samsung cellular phone on the person of **BELTRAN-Ochoa.** Upon further searching of the property, the investigative team located two wooden sheds behind the residence.

14. Within the wooden shed that Det. Buck had previously observed **DIARTE-Perez** and **BELTRAN-Ochoa** entering and exiting, the investigative team located cannisters of acetone, boxes of muriatic acid, propane tanks, large pans, blue fifty gallon barrels, multiple coolers, and two large freezers; all of these items were being used to form a methamphetamine conversion laboratory. The investigative team located two coolers within one of the large freezers. The two coolers were filled with finished methamphetamine. Each of the coolers contained approximately fifty pounds of suspected methamphetamine. A TruNarc test of the substance gave a presumptive positive result for methamphetamine.





15. Based on my training and experience, I know that acetone and muriatic acid are commonly associated with methamphetamine, post-production processing and conversion. Propane tanks, large pans, and barrels are consistent with heating, mixing, and handling bulk quantities of chemical solutions. Coolers and freezers are commonly used to crystallize and store finished methamphetamine and to preserve bulk products prior to packaging and distribution. The co-location of these chemicals with large-capacity containers (barrels), heat sources (propane), and temperature-control equipment (freezers/coolers) is strongly indicative

of an active methamphetamine conversion laboratory.

16. One of the pots in the shed contained white crystalline residue, believed to be methamphetamine, along with a clear pitcher.



17. Within the other wooden shed the investigative team located a fan, acetone, blue fifty gallon barrels, one-gallon pitchers, scoops, coolers, a digital scale, and large black tubs that were covered with black trash bags. The black trash bags had white crystalline stains on them as they were being used as a liner for the black tubs. These items were also being used to constitute a methamphetamine conversion laboratory, but to specifically to dry the methamphetamine.






18. Outside of the residence the investigative team located a white single axel trailer approximately 10 feet in length. Within the trailer was a 275-gallon IBC Container that was approximately two thirds full. The investigative team believed that the liquid was a mixture of diesel / liquid methamphetamine solution. The valve of the IBC Container had a small amount of crystallization, which is believed to be from the presence of methamphetamine.

///

///

///

///



19. Based on my training and experience, I know that methamphetamine in solution is frequently smuggled into the United States by mixing it with diesel fuel to avoid law enforcement detection. I also know that chemicals like acetone and muriatic acid are used during the methamphetamine conversion process to separate the methamphetamine from the solution it is mixed in, commonly diesel, in order to then extract the methamphetamine.

20. Within the residence the investigative team located the following within the living room area: an operable money counter, an air respirator, a digital scale, and a 380 caliber semi-automatic firearm that was within a black nylon case.

21. Within the master bedroom the investigative team located the following: a black 9mm Ruger semi-automatic firearm with serial number 860-34603 atop of a black chair on the right side of the bed. A magazine was inserted into the 9mm Ruger and had fifteen rounds of ammunition; however, no ammunition was inserted into the chamber. On the same chair, three cellular phones were located, a black Samsung with a scratch case, a black

Samsung without a case, and an orange Apple iPhone with an orange case. Under the mattress the investigative team located a black bag. Within the black bag was a large amount of United States Currency.

22. The investigative team conducted an approximate count of the bulk United States Currency that was located within the residence. The investigative team believes the amount of United States Currency is approximately $199,650.



23. Within the bathroom the investigative team located a black wallet on the countertop. Inside of the wallet was a Sinaloa Mexico Identification Card that bore the name of Individual 1. In addition, a Mexican passport was located inside of a Louis Vuitton bag bearing the name of **Jose DIARTE-Perez.**

24. Within one of the guest bedrooms, the investigative team located a black semi-automatic Colt 45 caliber handgun bearing serial number 300944-C. On a small nightstand adjacent to the bed the investigative team located four 45 caliber magazines that had live ammunition inserted into them. Inside the closet a Mexican passport bearing the name of Individual 1, was located. The investigative team also located a Tulare County Treasurer Tax Collector bill that was addressed to Individual 1 23284 Avenue 84 Terra Bella, CA.

25. Within the other guest bedroom only a money counter was located.

26. Based on my training and experience, individuals engaged in the manufacture

and distribution of controlled substances routinely arm themselves and maintain firearms on their person and at their residences to: (a) safeguard contraband and drug proceeds; (b) deter, resist, and retaliate against rival traffickers or others who may attempt to steal contraband or currency; and (c) enforce collection of drug debts and intimidate associates, couriers, and customers. In this investigation, three firearms were located in areas jointly accessible to **DIARTE-Perez and BELTRAN-Ochoa.** Given their ready accessibility and their proximity to large quantities of crystal methamphetamine, methamphetamine in solution, and hundreds of thousands of dollars in U.S. currency within the residence, I believe **DIARTE-Perez** and **BELTRAN-Ochoa** possessed these firearms in furtherance of their drug-trafficking activities—specifically, to protect the narcotics inventory and proceeds, to provide security for the conversion operation, and to facilitate enforcement of drug-related obligation.

27. **DIARTE-Perez** was interviewed by Det.'s Buck and Madrigal. Det. Madrigal is fluent in the Spanish language and advise **DIARTE-Perez** of his rights per Miranda. **DIARTE-Perez** stated that he understood his rights and agreed to answer questions. **DIARTE-Perez** stated that he lives at 23285 Avenue 84 and has been doing so for approximately two months. Prior to moving to this location, **DIARTE-Perez** stated that he was residing at another ranch on the other side of town. When **DIARTE-Perez** was asked about work, he stated that he won $32,000 at a local casino. **DIARTE-Perez** said that he could not talk about what is going on in the backyard because it would put his family in Mexico in danger. **DIARTE-Perez** confirmed that the single axel trailer did contain a methamphetamine diesel mixture. When **DIARTE-Perez** was questioned about whose methamphetamine this belonged to, he was unsure but believed it belonged to either Los Chapitos or El Mayitos. Los Chapitos is a drug trafficking organization ran by the sons of Joaquin GUZMAN-Loera commonly known as "El Chapo." El Mayitos is a drug trafficking organization ran by the children of Ismale ZAMBADA-Garcia commonly known as "El Mayo." Both GUZMAN and ZAMBADA are known figureheads of what is commonly referred to as the Sinaloa Cartel.

28. HSI SA Levers queried Department of Homeland Security (DHS) databases

regarding **DIARTE-Perez**. According to DHS databases on or about April 2, 2025, **DIARTE-Perez** was encountered by United States Border Patrol Agents near Otay Mesa, California. It was determined that **DIARTE-Perez** was a citizen and national of Mexico who had illegally crossed the United States / Mexico International Border. As a result of the apprehension, **DIARTE-Perez** was administratively removed from the United States on April 3, 2025, at the Harlingen, Texas Port of Entry.

29. **BELTRAN-Ochoa** was interviewed by Det.'s Buck and Madrigal. Det. Madrigal advised **BELTRAN-Ochoa** of his rights per Miranda. **BELTRAN-Ochoa** stated that he understood his rights and agreed to answer questions. According to **BELTRAN-Ochoa**, he has only been at the residence for six days. **BELTRAN-Ochoa** stated that he only feeds the livestock that is on the property. **BELTRAN-Ochoa** stated that he was residing in one of the guest rooms in the home.

30. During the execution of the residential search warrant at 23284 Avenue 84, the investigative team contacted **Lamberto ELORZA-Chavez** outside of the residence and immediately detained him. Upon detaining him, the investigative team detected the odor of acetone emanating from his person. The investigative team located on the person of **ELORZA-Chavez** a California Driver's License bearing number W8603516, it also featured the name of **Lamberto ELORZA-Chavez** and had the address of 23284 Ave 84, Terra Bella, California 93270.

31. The investigative team located Individual 2 and Individual 3 inside of the residence, within a bedroom, and detained them.

32. Upon entering the residence, the investigative team located what appeared to be pay / owe sheets on the couch. A pay / owe sheet is a document commonly associated with those involved narcotics transactions. The pay / owe sheet documents the quantity of narcotics given to a specific individual and also notates that amount of money that is owed by the individual.

33. During the search of the residence the investigative team located a religious shrine set up on a small table in the hallway. The religious shrine had multiple religious

statues and candles. Next to the religious statues was a large quantity of United States Currency.

34. Within the master bedroom on a nightstand on the left side of the bed the investigative team located a Strum, Ruger 9mm semi-automatic handgun bearing serial number 301-27778 and a Rock Island Armory 1911 45 caliber semi-automatic pistol bearing serial number RIA1755709. On a nightstand to the right of the bed, the investigative team located a Mexico Passport bearing the name **Lamberto ELORZA-Chavez**. Within the closet, the investigative team located an AR Pistol without any serial numbers and a Mexico Civil Registry document bearing the name **Lamberto ELORZA-Chavez**. The investigative team believes that the AR Pistol located within the closet is a privately made firearm (PMF) due to there not being any serial numbers.

35. In one of the bedrooms where the investigative team previously contacted and detained Individual 2 and Individual 3, a Target shopping bag was located behind the dresser with bulk United States Currency. In the top dresser drawer, the investigative team located a white garbage bag with bulk United States Currency. On the nightstand next to the bed the investigative team located a white Apple brand bag with bulk United States Currency. Near the bed the investigative team located a purse, within the purse was two Mexico Passports. One passport featured the name of Individual 2. The other Mexico Passport featured the name of Leocadio Individual 2. Within the Mexico Passports were United States Visas bearing the names and dates of birth of Individual 3 and Individual 2.

36. The investigative team determined that the approximate amount of money seized from the residence was $400,000 United States Dollars.

37. **ELORZA-Chavez** was interviewed by Det.'s Buck and Madrigal. Det. Madrigal advised **ELORZA-Chavez** of his rights per Miranda. **ELORZA-Chavez** understood his rights and agreed to answer questions. **ELORZA-Chavez** stated that he is the property owner of 23284 Avenue 84. **ELORZA-Chavez** stated that he is not the property owner of 23285 Avenue 84 and further explained that he does not know the individuals who are residing there.

38. HSI SA Levers queried Department of Homeland Security (DHS) databases regarding **ELORZA-Chavez**. According to DHS databases, **ELORZA-Chavez** is a citizen of Mexico and has previously been ordered removed from the United States by an Immigration Judge on or about May 14, 2012. As a result of being ordered removed, **ELORZA-Chavez** was returned to Mexico at the San Ysidro Port of Entry on or about May 17, 2012. Since that date, he has not received any legal status in the United States. As a result, **ELORZA-Chavez** is currently illegally and unlawfully in the United States and prohibited from possessing firearms.

39. ATF SA Sharma was contacted regarding the Rock Island Armory 1911 45 caliber semi-automatic pistol bearing serial number RIA1755709 that was located in the bedroom of **ELORZA-Chavez**. SA Sharma's training with ATF included learning how to read identifying markers on firearms and identifying the location in which firearms were manufactured. It is SA Sharma's opinion, based on his training and experience, that the Rock Island Armory, Model M1911 A1-FS, handgun bearing serial number RIA1755709 was manufactured outside of the State of California. Furthermore, it is the opinion of SA Sharma that if the firearm was found in the State of California, it would have necessarily traveled in and/or affected interstate and/or foreign commerce.

## III. CONCLUSION

40. Based on the foregoing, there is probable cause to believe that **Jose DIARTE-Perez**, and **Carlos BELTRAN-Ochoa** did knowingly possess with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1).

41. Based on the foregoing, there is probable cause to believe that **Jose DIARTE-Perez and Carlos BELTRAN-Ochoa** did knowingly conspire to manufacture, distribute, and possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 846, 841, and possess a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A).

42. Based on the foregoing, there is also probable cause to believe that **Lamberto ELORZA-Chavez** is an illegal alien in possession of a firearm, in violation of 18 U.S.C §

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

James E. Johnson, Special Agent
Homeland Security Investigations

This Affidavit was submitted to me by email/pdf and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1, and 41(d)(3).

DATED: September 15, 2026

HON. FRANK J. SINGER
United States Magistrate Judge

Reviewed as to form.

/s/ Kaitlyn Tobin
Kaitlyn Tobin
Assistant U.S. Attorney

**PENALTY SLIP**

| | |
|---|---|
| **COUNT 1:** | **JOSE DIARTE-PEREZ,<br>CARLOS BELTRAN-OCHOA** |
| **VIOLATION:** | **Conspiracy to Manufacture, Distribute, and Possess with Intent to Distribute Methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1)** |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life<br>$100 Special Assessment (mandatory on each count) |
| **COUNT 2:** | **JOSE DIARTE-PEREZ,<br>CARLOS BELTRAN-OCHOA;** |
| **VIOLATION:** | **Possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)** |
| **PENALTIES:** | Maximum of life in prison,<br>Fine of up to $250,000; or both fine and imprisonment<br>Up to a three-year term of supervised release |
| **COUNT 3:** | **LAMBERTO ELORZA-CHAVEZ** |
| **VIOLATION:** | **Illegal Alien in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(5)** |
| **PENALTIES:** | Maximum of 15 years in prison,<br>A fine of up to $250,000 fine, or both,<br>A term of Supervised Release of up to three years<br>$100 Special Assessment (mandatory on each count) |